Joseph Hamme v. Commissioner. R. H. Hamme v. Commissioner.
Hamme v. Commissioner
Docket Nos. 36037, 36038.
United States Tax Court
1953 Tax Ct. Memo LEXIS 319; 12 T.C.M. (CCH) 335; T.C.M. (RIA) 53100; March 30, 1953
*319 Stanley Worth, Esq. c/o Blair, Korner, Doyle & Appel, 404 Transportation Building, Washington, D.C., and Edward S. Smith, Esq., for the petitioners. E. M. Woolf, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax as follows: Year
Joseph Hamme
R. H. Hamme
1944
$ 856.96
$ 1,014.06
1945
555.20
727.87
1946
1,012.54
1,267.41
1947
11,034.16
10,680.17 The issues for decision are whether amounts received in each year under contract dated March 4, 1944, were royalties taxable as ordinary income or were payments of purchase price taxable as capital gain, and whether all of the income is taxable to the petitioners or whether one-half is taxable to their wives. Findings of Fact The petitioners filed individual income tax returns for the taxable years with the collector of internal revenue for the District of North Carolina. The petitioners, brothers, while prospecting in the fall of 1942, found deposits containing tungsten in Vance County, North Carolina. They and their wives pooled their resources, borrowed some additional funds and obtained options on land *320 surrounding the deposit which they had discovered. Those four persons are referred to herein at times as the Hammes. They did not have the funds or the ability to develop the property and they leased and subleased the lands to Haile Gold Mines, Inc., by a lease dated July 31, 1943. The Hammes were described in the lease as landlords and Haile Gold Mines, Inc., as tenant. The lease also covered a mill and some machinery and equipment. It gave the tenant the right to take all minerals under the tracts of land covered by the lease. The lease was to continue until April 15, 1944, unless sooner terminated. The rent was to be paid to the four individual landlords in equal monthly installments in amounts set forth in a separate agreement also dated July 31, 1943. The lease described surface rights given to the tenant. It gave the tenant the right to purchase from the landlords all of their right, title and interest in all minerals, ores, clays, earth and stone in, under, or upon the land, together with the machinery and equipment and all mining rights at prices set out in the supplemental contract, during the last thirty-one days of the lease. It also gave the tenant the right to acquire *321 for $10 the fee to such acreage as might be required for operating purposes. The properties covered by the lease were: 1. The Walker tract of 584.7 acres held b0 the four Hammes as tenants by the entireties. 2. The John G. Morton tract of 45 acres, title to which was in Joseph and Richard H. Hamme. 3. A tract of 551.2 acres which Annie Venable Morton, et al. had leased to Joseph and Richard H. Hamme on August 31, 1942 for 15 years. 4. The Gholson tract of 15.4 acres on which the mill was located. That tract contained no mineral. The title to it was in the names of Joseph and Richard H. Hamme. 5. The Moore tract of 107 acres which was held by the four Hammes as tenants by the entireties. The interests of the four Hammes in all five of the above properties were equal. The other agreement dated July 31, 1943, provided that the tenant should pay the landlords 20 per cent of the net money derived from sales of ore or concentrates during the preceding month and that the price to be paid under the option was $10,000,000. Payments of that amount were to depend upon the sale price of the concentrates mined. The name of Haile Gold Mines, Inc., was changed to Haile Mines, Inc. *322 , on September 13, 1943. The Hammes and Haile Mines, Inc., entered into an agreement dated March 4, 1944 called an "Indenture" providing that in consideration of the payment of $2,000 in cash and of "royalty payments and other payments contracted to be made in the future" the Hammes "bargained and sold" property consisting of equipment and of the five tracts described in the lease of July 31, 1943, "TO HAVE AND TO HOLD said leasehold, personal property and the lands above described, together with all rights, privileges and appurtenances thereunto appertaining, unto the said party of the second part, its successors, and assigns, in fee simple forever." The conveyance was made subject to the condition that Haile Mines, Inc., would make payments in accordance with the terms of a contract entered into on the same date "covering royalties to be paid in the future" to the Hammes. It provided further that in case of uncured default Haile Mines, Inc., would reconvey the properties to the Hamme Group, together with all rights of Haile Mines, Inc., in 256 acres of adjoining land consisting of the Scott and Sneed tracts. The instrument contained a general warranty but was subject to a deed of *323 trust securing a note in the amount of $2,268 which liability was assumed by Haile Mines, Inc., as a part of the consideration "for this conveyance." The other agreement entered into by the same parties on March 4, 1944, is entitled "Contract". It provides that in consideration "of the conveyance of a leasehold, certain personal property and certain land made by deed of even date herewith", Haile Mines, Inc., agrees to pay the Hamme Group "in equal amounts to each of them royalties on ores, minerals, concentrates or any mineral products derived and sold from the lands or mineral rights acquired" by Haile Mines, Inc., in Townsville Township, Vance County, North Carolina, "said royalties to be based on net sales or net mint or smelter returns and to be at the rate of 10% on any minerals or mineral products other than tungsten ores or concentrates, and on tungsten ores or concentrates to be at the rate of" 10, 15 or 20 per cent depending upon the WO3 content of the ore sold or milled as determined monthly. Royalty payments were to be made on the 20th of each month covering the sales for the preceding month. A minimum of $10,000 in royalties was to be paid in every six months regardless *324 of sales, but the payments were to be cumulative so that any excess over $10,000 for one six months period would be carried forward as applicable to the minimum required for any subsequent period. There was to be a reconveyance of the properties to the Hammes in case of uncured default. Haile Mines, Inc., agreed to buy for $20,000 or less the fee to the land covered by the Morton lease if the Hammes could negotiate such a purchase, and in that case the royalty under the existing Morton lease would go to the Hammes, but if it was unable to purchase land, then the Hammes were to "receive an over-riding royalty of 2% on the net sales or mint or smelter returns of any mineral, ores or products removed from the Morton land sold by the party of the first part [Haile Mines, Inc.] prior to the possible acquisition of the property." It was further provided that if the Hammes or the Haile Mines, Inc., acquired additional lands or leases within a radius of 10 miles of the mill, those properties would be subject to the agreement or some mutually satisfactory arrangement. Haile Mines, Inc., agreed to make reasonable efforts to acquire outstanding interests in the Sneed land, to carry on litigation *325 to protect the boundaries of the Walker land and to reassign the Morton lease if it decided to abandon it. The combined cost to the Hammes of all of the properties conveyed by the instrument of March 4, 1944, was $33,609.87, for which amount they were reimbursed by Haile Mines, Inc., so that in 1944 the Hammes recovered their full basis for the properties conveyed. The Hammes received royalties during the taxable years under the agreements above described from Haile Mines, Inc., or its assignee, Tungsten Mining Corporation. Those receipts for the years 1944 through 1946 were reported as royalty income on partnership returns filed in the name of Hamme Brothers on Form 1065. Those returns show the distributive shares of the petitioners and their wives in four equal amounts and each reported one-fourth as ordinary income in his or her return for each year. An amended partnership return was filed for 1946 reporting one-half of the amount received as a long-term capital gain from a sale of real estate in 1944. The individuals filed amended returns on Form 1040 accompanied by claims for refund. No partnership return was filed for 1947 but each of the Hammes filed individual returns on *326 Form 1040 reporting one-fourth of the total receipts as a long-term capital gain of which one-half was taxable. The Commissioner, in determining the deficiencies, reduced the receipts by 15 per cent to represent depletion, allocated one-half of the remainder to each petitioner and treated it as ordinary income for each year. The petitioners had an economic interest during the taxable years in the mineral deposits covered by the contracts dated March 4, 1944. Each of the petitioners was entitled to only one-fourth of the amounts received in each year from Haile Mines, Inc., and Tungsten Mining Corporation. Those amounts were ordinary income and were not amounts realized from the sale of capital assets. All facts stipulated by the parties are incorporated herein by this reference. Opinion MURDOCK, Judge: It is well established that the names which contracting parties use in describing their contracts and payments thereunder do not necessarily determine the tax consequences of their acts. Here they referred to one contract of March 4, 1944, as a deed of conveyance, and it has certain characteristics of a deed, but it also has some characteristics of a lease. Passing of title *327 and the time of its passing under local law are likewise not determinative of tax liability in a case like this. The question is whether payments under the two instruments entered into on March 4, 1944, based upon production and sale of minerals, are royalty payments taxable as ordinary income or whether they are purchase price taxable as capital gain. There is no controversy about the cash payments not based upon production which the Hammes received. Assistance in deciding that question can be gained from statements of the Supreme Court on the closely related question of whether the person receiving payments from the production of mineral has an economic interest in the minerals in place which is depleted by production so that the person is entitled to a depletion allowance on the royalties received. The Supreme Court in , in discussing that question, said that the right to depletion does not depend upon the retention of ownership or any other particular form of legal interest in the mineral content of the land, but it is enough if by virtue of the transaction the person retains a right to share in the mineral produced, citing , *328 and . It said in : "Depletion depends only upon production. It is the lessor's lessee's or transferor's 'possibility of profit' from the use of his rights over production, 'dependent solely upon the extraction and sale of the oil,' which marks an economic interest in the oil." Here the payments in question were measured entirely by production and sales. They represented the Hammes' possibility of profit from the use of their rights over production. Both parties to the contracts of March 4, 1944, depended upon the subsequent extraction and sale of the mineral for the return of their investments. The royalties were to continue as long as the mineral was extracted, and if the operator ceased to pay the royalties, the contract was to terminate and the land was to be returned to the Hammes. The Court said in : "* * * The holder of a royalty interest - that is, a right to receive a specified percentage of all oil and gas produced during the term of the lease - is deemed to have 'an economic interest' in *329 the oil in place which is depleted by severance." The following is from : "* * * A decision on the category of expenditures to which these 50% disbursements belong affects both the operators who make them and the owners, lessors, vendors, grantors, however they may be classed, who receive them. If they are capital investments to one, they are capital sales to the other. If they are rents or royalties to one, they are rents or royalties received by the other." The same Court in , recognized that the ownership of mineral passes at some time to the one who extracts it, but notwithstanding that incidental transfer of ownership the taxation as income of the receipts of the former owner does not produce the kind of hardship aimed at by the capital gains provisions of the taxing act since extraction of mineral is a time-consuming operation and the payments do not normally become payable as the result of a single transaction within one year. It must be held under the cited cases that the Hammes did not part with all they owned but retained an economic interest in the mineral which *330 would give them a right to depletion. The payments in question then could not be of purchase price taxable as capital gains but were what the parties called them, royalties, taxable as ordinary income. Cf. , affd. , certiorari denied ; . The so-called royalties which the Hammes were to receive and which they actually received included not only royalties on the ore extracted from the lands covered by the contracts of March 4, 1944, but also amounts based upon the ore extracted from other properties in which the Hammes had never had any interest. Regardless of whether those latter payments were royalties, obviously, they were ordinary income to them and not capital gains. They probably were paid to the Hammes because of their discovery of the tungsten deposits in the general area. The case of , relied upon by the petitioners, is distinguishable on the facts. There, a large initial payment in excess of the cost of the properties was made, deferred payments in large amounts were *331 payable absolutely and the parties emphatically stated that the grantor retained no interest whatsoever in the property transferred, while here the initial payments were smaller, reimbursing the petitioners only for their costs, there were no deferred payments except from production, and the petitioners' only chance of profit lay in future production from the properties. Furthermore, the properties were to be returned to the Hammes in case production ceased and there was default. The evidence shows that the wives of the two petitioners had interests in the properties and in the contracts equal to those of their husbands and each petitioner is entitled to one-fourth only of the payments. The Commissioner's argument to the contrary is weak and in this respect his determination is in error. Decisions will be entered under Rule 50.